IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 06-13-JJF |
| | ) | |
| DEMETRIUS BROWN, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT DEMETRIUS BROWN'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

COMES NOW, the defendant, Demetrius Brown, by and through his counsel, John P. Deckers, and presents his proposed findings of fact and conclusions of law in accordance with this Court's Order.

**Introduction**

Demetrius Brown (hereinafter "Brown") was originally indicted on February 6, 2007 on two counts, each alleging violations of 21 U.S.C. §841(a)(1) and (b)(1)(A). Count I allegedly occurred on December 9, 2005 and Count II allegedly occurred on December 14, 2005. Subsequently, Brown pleaded guilty to Count II; the government, while not bound by a plea agreement, agreed to dismiss Count I upon defendant's guilty plea. The Court then scheduled a separate evidentiary hearing in light of the government's announcement that it would seek a relevant conduct enhancement based on the allegations contained in Count I.

At stake in this proceeding is a substantial period of imprisonment: if the Court finds that the drugs in Count I are attributable to Mr. Brown, then the guidelines call for an offense level increase of eight (8).

An evidentiary hearing was held on June 13, 2007. At the conclusion of that hearing, the Court deferred setting a briefing schedule in light of <u>United States v. Tracy Lamar Fisher</u>, which was pending in the Third Circuit Court of Appeals and which involved the burden of proof applicable in assessing a defendant's relevant conduct for sentencing purposes. The Third Circuit decided <u>United States v. Fisher</u> on September 10, 2007, and this Court set forth a briefing schedule accordingly. This is Mr. Brown's proposed findings of fact and conclusions of law addressing whether any relevant conduct should be attributed to him for sentencing purposes under USSG § 1B1.3.

## **Findings of Fact**

At the June 13, 2007 evidentiary hearing, the government presented two witnesses: Detective Thomas Looney, of the Wilmington Police Department, and Rashan J. Baul. Mr. Brown also offered testimony on his own behalf.

Detective Looney (hereinafter "Looney") testified that, on December 8, 2005, he received information from a reliable informant that a black male known as "Meter Man" or "Pack Eater" was in the 2200 block of Pine Street, in Wilmington, selling drugs. (T-8)[1] Looney stated that he was familiar with this particular nickname and he linked it to the defendant, Demetrius Brown, with whom he had previous dealings in the Riverside area. (T-8) Det. Looney conceded that he didn't conduct a simple records check of Mr. Brown to see if he was wanted or whether he had a valid driver's license. (T-36-37)

Looney further indicated that, at approximately 8:30 or 9:00 PM on December 8, 2005, he observed a silver Chevy Lumina with Delaware temporary registration tags parked

---

[1] "T-__" refers to a page of the transcript of the Evidentiary Hearing held before the Court on June 13, 2007.

2

on the 2200 block of Pine Street. He testified that several black males, including Mr. Brown, were congregated around the vehicle. (T-10-14) Looney stated that Brown entered the driver's side of the Lumina, and drove northbound on Pine Street. (T-16) Looney took no action to stop the vehicle to confirm that the driver was, in fact, Mr. Brown. He took no action to determine whether Mr. Brown was properly licensed to drive. He took no action to stop the vehicle despite having purportedly received information (that very day from a "reliable" source) that Brown possessed drugs in the vehicle. (T-42-43)

On the following day, December 9, 2005, Looney was again working in the area of 2200 North Pine Street in a uniform capacity. He testified that he observed five individuals in front of 2225 North Pine Street: Mr. Brown, one other male, and three females. (T-17-18) Detective Looney rode past the group, stopping briefly to tell them to "move on their way." (T-18-19, T-47) Looney could offer no legal justification for his command to "move along" and he did not attempt to confirm who the people were, or whether they were lawfully present at that location. (T-47)

Looney then circled the block. Upon arriving back at Pine Street, he reportedly observed Mr. Brown within inches of, and looking into, the Chevy Lumina. Looney testified that, as his vehicle approached the area, he observed Mr. Brown to put "some distance" between himself and the Chevy Lumina. (T-19-20, T-49) Looney admitted, however, that the seven bags of drugs at issue in this hearing, were in plain view on the front seat of the Chevy Lumina, and could easily catch the eye of a passerby. (T-49-50)

Looney later discovered that the Lumina was locked and needed a key to both open and operate. During the second trip through Pine Street, Looney had Brown under constant

3

surveillance. At no point did Looney see any keys in Mr. Brown's hands, nor did he see Brown make actual physical contact with the vehicle. (T-50)

Looney drove up to where Brown was and asked for his name. When Brown replied, "Donald Brown," Looney asked why he was lying. Brown responded by saying that he had some pending warrants. Looney then testified that he told Brown "don't run", at which time Brown took off southbound on Pine Street and then westbound on 23rd Street. Looney took up a brief, unsuccessful pursuit. (T-21-22)

Looney originally testified that, when Brown ran, he discarded two objects, one of which was "definitely plastic" as he could tell from the sound it made when it hit the sidewalk. (T-22) Upon cross-examination, however, Looney conceded that he didn't actually see the defendant reach into his pocket and discard the two objects; rather, he "heard 'em hit the ground." (T-54) He also conceded that the area of Wilmington where this incident occurred was a high crime/high drug area and that it is not uncommon to find discarded drugs and drug paraphernalia in the area. (T-56) In fact, a fellow Wilmington police officer found two drug scales in the 2200 block of North Pine Street, within two weeks of the incident in question. (T-56-58)

After being confronted by his previous grand jury testimony, Looney retreated from his assertion that Brown discarded a plastic scale and a bag containing marijuana from his person. He indicated that he could not know for sure that Brown discarded the two objects and, moreover, that he didn't see Brown discard the two objects. (T-58, 59-62) Candidly, Looney agreed that he couldn't have heard the bag of marijuana hit the ground. (T 58-59)

After Brown was out of sight, Looney went back to the corner of 23rd and Pine and retrieved a scale and a bag of marijuana. He also illuminated the front driver and passenger

4

seats of the Chevy Lumina and, upon doing so, noticed several bags of crack cocaine. He also observed, in the center of the rear bench seat, a plastic bag containing crack, and an Al's[2] Sporting Goods bag containing a glass Pyrex pot that had white residue on the rim. (T-24) Looney testified that these pots are commonly used to cook cocaine. (T-25-28) The Chevy Lumina was then towed to the Wilmington Police station. A subsequent search of the trunk revealed a box of plastic sandwich bags, numerous loose sandwich bags, plastic CD cases and a Motorola cell phone. (T-33-35, T-66, 75)

Downtown Visions had cameras in place in that area of Wilmington. Looney never attempted to determine whether cameras were positioned on the block in question, however, and he never attempted to obtain surveillance video of the incident on December 9, 2005. (T-67-68) Looney also recognized that many of the seized items, including the plastic scale, the sandwich bags, the plastic CD cases, the Pyrex dish, and the Motorola cell phone had prime surfaces where latent fingerprints could possibly be obtained. The vehicle, itself, had many surfaces where fingerprints could be located. The police recovered no identifiable fingerprints linking Mr. Brown to any of the items, however. (T-69-75) Similarly, the police did not attempt to determine the ownership of the Motorola cell phone, and they did not attempt to identify or track any of the contacts or calls which might have been recorded in the phone's memory. (T-75-77) Finally, the police failed to preserve a blue and red coat that was in the vehicle. Looney could not tell whether the coat was male or female, and he could not tell the size. Certainly, he could not link the jacket to Brown. (T-64)

---

[2] The transcript throughout designates the bag as an "owl's sporting goods bag" however counsel is unfamiliar with any such luggage. Counsel believes that the bag was from Al's Sporting Goods.

No fingerprints linked Brown to the Chevy Lumina. Rather, someone else's fingerprints were recovered from the vehicle. (T-72-73) Looney did testify that he attempted to ascertain the owner of the Chevy Lumina, however, and the registration records indicated that the owner was Rashan Baul. Looney interviewed Baul on December 14, 2005, and Baul claimed that he had sold the Lumina to a black male. When Looney inquired further regarding the black male's identity, Baul stated the police already knew who it was. (T-29-30)

Baul testified at the evidentiary hearing, but did not remember saying those things to Looney. (T-120) Rather, Baul claimed that, when Detectives Looney and Ciber came to his shop, he told them that he had sold the vehicle to a gentleman he knew only as Meter Man. (T-105) Baul also said that he picked this person out of a photo line-up given to him by the police. (T-107)

With great hesitation, Baul conceded on cross-examination that he had seven adult felony convictions, eight juvenile adjudications for felonies and that he had, just last year, been convicted of theft of services along with other misdemeanor convictions for crimes involving falsehood or dishonesty. (T-111-112) At the time of his testimony, Baul also had a pending state burglary charge. (T-113)

Baul testified that he originally purchased the vehicle on November 23, 2005 from Goodwill Industries. He was able to produce a receipt, temporary tags, a temporary registration and a bill of sale. (T-95-97) He claims that, when he turned around and sold the vehicle to Brown, the only documentation was a scribbled note that reads: "Sold to Meter Man on 11/26/05." (T-101; Gov. Exhibit 13) Baul was aware of the obligations imposed upon him as a seller and/or buyer of a motor vehicle to properly transfer the registration/title.

6

(T-115, 117)  While he claimed to be a legitimate businessman, he never met his legal obligations in the alleged transfer to Brown.  (T-122-123)  Baul also attempted to distance Larry Lee, a recent customer of his (T-116), from the sale of this particular vehicle.  Baul refused to acknowledge the obvious, however: that Larry Lee negotiated the price of the vehicle. (T-117-119)

The final witness at the evidentiary hearing was Demetrius Brown.  Mr. Brown acknowledged that he was in the 2200 block of North Pine Street on December 9, 2005, and that he encountered Detective Looney.  (T-127-128)   Brown also conceded that, when Looney asked his name, he falsely replied, "Donald Brown."  He gave Looney that name because he had warrants out on him and he didn't want to get locked up. (T-128-129)  At Detective Looney's command, Brown unzipped and exposed his pockets, and lifted his shirt to ensure that he did not have a weapon. (T-129)  Once Looney placed the patrol car in park and called for backup, he ran and hid in a nearby block. (T-129-130)

Mr. Brown denied having any drugs or drug paraphernalia on him at that time.  He denied dropping a bag of marijuana or a scale.  He indicated that the car he was driving at that time was a Ford Crown Victoria.[3] (T-130-131)

Brown did not own, possess, acquire, or attempt to use any of the drugs in the Chevy Lumina.  Nor were the drugs intended for his use or possession.  Nor was he intending to transport the drugs to someone else.  Mr. Brown had no intentions of using the vehicle in any way whatsoever to possess, transact or transport the drugs.  (T-132)  Finally, Brown did not

---

[3]   When Mr. Brown was arrested on December 14, 2005 and charged with possession with intent to distribute crack cocaine, Count II of the indictment, he was traveling in a Ford Crown Victoria. (T-136)

own or possess the Pyrex dish found in the Chevy Lumina or any of its other contents, including the cell phone. (T-133)

## Conclusions of Law

The government seeks to enhance Mr. Brown's sentence with a showing that the conduct described in Count I of the indictment is attributable to him. Pursuant to the Federal Sentencing Guidelines, specifically USSG § 1B1.3, relevant conduct is defined as:

> (A) All acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and…
>
> (2) Solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A)… above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

Mr. Brown recognizes that, if the government meets its burden of proof in showing that he has committed the alleged act (i.e. possession with intent to distribute more than 50 grams of crack), then this conduct involves a similar course of conduct or common scheme or plan to meet the requirements of subsection two of §1B1.3 of the USSG. However, Mr. Brown asserts that the Government has not met its burden of proof under the facts adduced at the evidentiary hearing.

This Court judiciously waited for the Third Circuit to decide <u>United States v. Fisher</u>, 2007 U.S. App. LEXIS 21649 (3rd Cir. 2007) before proceeding with the sentencing of defendant. Prior to <u>Fisher</u>, the Third Circuit had held that when sentencing enhancements on the defendant's sentence are so substantial as to constitute "the tail that wags the dog", the facts must be established by clear and convincing evidence. <u>United States v. Kikumura</u>, 918 F.2d 1084, 1098-1103 (3rd Cir. 1990). The Third Circuit clarified its position earlier this year in <u>United States v. Grier</u>, 475 F.3d 556 (3rd Cir. 2007), holding that factors affecting

sentencing, even when those facts would constitute a separate offense, only need to be proven by a preponderance of the evidence. Id. at 565.  Since the sentence imposed in Grier was within the guideline range, the Third Circuit did not rule on whether the clear and convincing standard set forth in Kikumura remained viable.

In Fisher, it appears that the Third Circuit has finally laid Kikumura to rest and has ruled that, in light of the Supreme Court holding in United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and the Third Circuit *en banc* holding in Grier, and in light of the advisory nature of the sentencing guidelines, the clear and convincing evidence standard announced in Kikumura is no longer valid. Fisher, supra at *33.

Simply determining the standard that this Court must use in order to determine relevant conduct (i.e., by a preponderance of the evidence), does not end the inquiry.  In addition to determining the government's burden, there are still several remaining issues to be considered by the Court.

First, Mr. Brown submits that **the Court must find specific evidence** that connects him to a particular quantity of drugs.  In United States v. Shonubi, 103 F.3d 1085 (2nd Cir. 1997), the Second Circuit remanded a finding of drug quantity because the Government had failed to provide "specific evidence" that the defendant was connected to the drugs in question.  Shonubi was arrested at the JFK airport after arriving from Lagos, Nigeria.  He was detained and found to have 103 balloons of heroin on his person totaling 427.4 grams. Id. at 1087.  The Government attempted to introduce evidence that Shonubi had made numerous other trips from Nigeria, and that each trip engendered Shonubi (or someone acting on his behalf) bringing back significant quantities of heroin which should be aggregated as relevant conduct for sentencing purposes.  Despite the fact that drug records

9

from the DEA and customs were introduced at trial, and the fact that Shonubi admitted multiple trips from Nigeria to the United States, and testimony about the economics of heroin swallowing, the Second Circuit found that there was no "specific evidence" of drug quantity carried by Shonubi on his prior seven trips from Africa. Id. at 1090.

In addition to finding that specific evidence links a defendant to a certain quantity of drugs, **this Court must also find that Mr. Brown possessed the drugs, either through evidence of actual possession or constructive possession**. "Dominion and control are not established, however, by 'mere proximity to the drug, or mere presence on the property where it is located or mere association with the person who does control the drug or the property.'" United States v. Jenkins, 90 F.3d 814, 818 (3rd Cir. 1996), quoting United States v. Brown, 3 F.3d 673, 680 (3rd Cir. 1993).

In Jenkins, the Third Circuit found insufficient evidence to establish possession of cocaine. Although Jenkins was found in the apartment of a known drug dealer and two scales were found in the apartment, no cocaine residue was found on him, nor were his fingerprints found on the drugs. Only proximity linked him to the drugs and drug distribution paraphernalia. Id. at 818.

Even if the Court finds as fact that Mr. Brown may have been seen driving the Chevy Lumina and may have had keys to the vehicle at one point in time[4], that fact alone does not provide sufficient evidence to prove possession of the drugs on December 9, 2005.

In Brown, the Third Circuit found insufficient evidence of possession where the defendant had a key to an apartment which housed substantial quantities of heroin, cocaine

powder and crack cocaine. The Court found that the fact that the defendant had a key, attempted to enter the apartment, and made a statement indicating that she was aware that the apartment was a known "cut house" merely showed that she had some control over the house, but not the drugs. Brown, supra at 682-683. Again, none of the defendant's fingerprints were found on the drugs or drug paraphernalia and there was no evidence that she had ever exercised any indirect control of the drugs or drug paraphernalia. Id.

In addition to the requirements of a finding of "specific evidence" and of possession, either actual or constructive, Mr. Brown contends that **the evidence** the Court must rely upon, even under a preponderance of evidence standard, **must have a "sufficient indicia of reliability" to assure fact finding reliability at sentencing**. United States v. Miele, 989 F.2d 659, 664 (3rd Cir. 1993). This standard is codified in the sentencing guidelines pursuant to USSG §6A1.3(a) which provides that disputed matters at sentencing shall be resolved by the court considering relevant information . . . "provided that the information has sufficient indicia of reliability to support its probable accuracy." USSG §6A1.3.

In Miele, the Third Circuit remanded a case for re-sentencing after finding that a dispute regarding drug quantity at sentencing could not be based merely on disputed testimony from a known informant. The court stated that this "sufficient indicia of reliability" standard should be applied rigorously. Given the inconsistency in testimony, the Court found that the Government had not met that standard. Id. at 684.

---

⁴   When Mr. Brown was arrested, he was not in possession of keys to the Chevy Lumina, and he testified that he did not have any car keys on him when he encountered Detective Looney on December 9, 2005. (T-130)

11

In <u>United States v. Brothers</u>, 75 F.3d 845 (3rd Cir. 1996), the Third Circuit reiterated its concern that evidence with sufficient indicia of reliability must be presented, particularly when the court is dealing with a drug case. The court stated:

> In a drug case, the amount of drugs involved has a substantial impact upon the severity of the punishment. Accordingly the need for sufficient indicia of reliability is particularly manifest when findings regarding the quantity of drugs are predicated upon evidence which standing alone does not meet the higher standard of admissibility.

<u>Id</u>. at 846.

While the <u>Brothers</u> case dealt mainly with hearsay evidence in direct conflict with sworn testimony, the "sufficient indicia of reliability" principal is still the overriding concern of the Court when it comes to relevant conduct evidence. <u>Id</u>. at 848.

Applying the applicable law to the present case it seems clear that, even under the relaxed preponderance of the evidence standard, the Government cannot attribute the additional 77 grams of "crack" cocaine to Mr. Brown. There is no "specific evidence" which supports the proposition that the 77 grams of "crack" cocaine was possessed, either actually or constructively, by Mr. Brown.

The government has attempted to tie Mr. Brown to the Chevy Lumina through the testimony of Rashan Baul, a seven-time convicted felon, who had recently faced federal weapons charges and who had a pending felony Burglary charge at the time of his testimony. Baul claimed that he sold the Chevy Lumina to Mr. Brown, but none of the required legal paperwork existed to link Brown to the vehicle. Moreover, no physical evidence created a connection between Brown and the vehicle.

In addition, the government asserts a bald allegation that Detective Looney received information from a 'reliable' source that Mr. Brown was selling drugs in the 2200 block of

Pine, operating a Chevy Lumina with temp tags and, finally, possessed a large quantity of drugs in the vehicle. Notably, that source of information was not deemed past proven and reliable – just reliable. Moreover, the government has offered no evidence whatsoever for the Court to independently evaluate the alleged 'reliability' of the information source. The Court should not, in a matter as important as this, simply accept the opinion testimony of the investigating police officer that his source of information was 'reliable.' The government may argue that, in fact, a car bearing that description was seen in the area. On the other hand, the government must concede that the vehicle was easily observable by anyone and, moreover, that some vehicles in drug areas are virtually community property. (T-77-78)

The only specific and arguably credible evidence of a connection between Brown and the Lumina is the testimony of Detective Looney, who indicated that he saw Mr. Brown: (a) get into the driver's side of the vehicle the day before the drugs were found and (b) stand near and facing the vehicle on December 9, 2005, the date the drugs and the vehicle were seized by the Wilmington Police.

Far from finding specific evidence of actual or constructive possession, the Court should note the dearth of evidence in this case. In reality, the Wilmington Police had the means and ability to engage in a meaningful investigation to either incriminate or exonerate Mr. Brown. The police, instead, treated this case, as Mr. Kravetz suggested in his questioning of Detective Looney, that this was a mere "run-of-the-mill drug case". (T-90) **When the potential impact is an eight level sentencing increase, the Court should countenance neither a cavalier investigative approach, nor a less-than-thorough examination of readily available information.**

The lack of any of Mr. Brown's fingerprints on the multiple surfaces of the vehicle, on the plastic bags and multiple CD cases in the trunk of the vehicle, or on the Motorola cell phone are casually explained away by the government as being elusive evidentiary concepts in a criminal investigation. The failure of the police to seek hair, fiber or DNA samples is brushed off as excessive, unrealistic -- the subject of television shows, but not real life.

The government cannot easily ignore the other failures in the investigation, however. In the words of Detective Looney, some of these seemingly common-sense investigative techniques were not even thought of at the time. (T-75-76) The Motorola cell phone not researched for purchaser/ownership information, and the phone was not even turned on to attempt a retrieval of names and numbers called or stored. Drug dealers frequently use cell phones to carry on their trade; this cell phone was found among drug paraphernalia. The Downtown Visions cameras were not sought out for possible clues that, again, could either incriminate or exonerate. No effort was made to determine whether those cameras were in existence at the time of this investigation. A jacket found in direct proximity to the bulk of the seized drugs was neither seized, identified, nor preserved. That jacket, by the way, was never linked to Mr. Brown. Finally, one of the most basic methods of determining 'possession' is, simply, by asking questions. Detective Looney could not 'recall' if Mr. Brown was ever asked about the drugs in the Chevy Lumina. Conversely, Mr. Brown testified under oath that he knew nothing of the drugs and that he did not possess them, either actually or constructively.

Detective Looney candidly admitted that one of his basic duties as a police officer is to identify, collect and preserve evidence that either incriminates or exonerates. (T-69) That just didn't happen in this case.

**Conclusion**

The evidence presented by the government, while lacking in specificity, also does not show either actual or constructive possession of the drugs. Proximity alone is insufficient to prove possession of drugs; the government has shown proximity to the vehicle and, perhaps, dominion and control on a different occasion. No fingerprints, no DNA, no hair sample, no cell phone records of ownership, no reliable informant testifying that Mr. Brown sold him drugs from that vehicle that day, nothing other than proximity. No specific, reliable evidence was presented to show dominion and control over the drugs. The evidence presented by the government -- that Detective Looney observed Mr. Brown near or next to the vehicle and the testimony of a convicted felon regarding the 'ownership' of said vehicle -- does not have a sufficient indicia of reliability in order to support its probable accuracy. United States v. Brothers, 75 F.3d 845, 848 (3rd Cir. 1996). Therefore, in determining Mr. Brown's relevant conduct, the Court should not rely upon this information in order to support an enhancement pursuant to USSG §1B1.3.

Based upon the facts and legal authorities set forth above, Demetrius Brown, respectfully requests that this Honorable Court exclude the 77 grams of "crack" cocaine found by the Wilmington Police on December 9, 2005, from consideration under the relevant conduct provisions of USSG §1B1.3.

                Respectfully Submitted,

                  //s// **JOHN P. DECKERS**
                John P. Deckers, Esquire (#3085)
                800 N. King Street, Suite 302
                Wilmington, DE  19801
                (302)656-9850
DATED:  November 21, 2007      Attorney for Demetrius Brown

## CERTIFICATE OF SERVICE

I, John P. Deckers, counsel for the Defendant, do hereby certify that, on this  21st  day of November, 2007 that

1. I electronically filed the attached document (**Proposed Findings of Fact and Conclusions of Law**) with the Clerk of the District Court using CM/ECF which will send notification of the filing to the following registered participant(s):

>ROBERT F. KRAVETZ, Esquire
>Assistant United States Attorney
>U.S. Department of Justice
>The Nemours Building
>1007 Orange Street, Suite 700
>P.O. Box 2046
>Wilmington, DE 19899-2046

2. I caused one copy of the attached **Proposed Findings of Fact and Conclusions of Law** to be served via first class mail to the following person(s):

>Demetrius J. Brown, SBI # 338748
>Howard R. Young Correctional Institute
>P.O. Box 9561
>Wilmington, DE  19809.

>   //s// **JOHN P. DECKERS**
>John P. Deckers, Esquire (#3085)
>800 N. King Street
>Suite 302
>Wilmington, DE 19801
>(302) 656-9850
>Attorney for the Defendant

DATED:     November 21, 2007